**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Quatrela Pate, individually and as Guardian ad Litem for D.P., a minor, | 2:12-cv-01377-JAD-PAL |
| Plaintiff | **Order Granting Wal-Mart's Emergency Motion to Enforce Settlement and Denying Motion to Continue Trial as Moot** |
| v. | **[ECF No. 61, 75]** |
| Wal-Mart Stores, Inc. dba Wal-Mart Supercenter #2592, | |
| Defendant | |

This personal-injury action between plaintiff Quatrela Pate (on behalf of herself and as guardian ad litem for her minor son, D.P.) and Wal-Mart was resolved just before trial. But Pate became dissatisfied with her cut of the settlement and refused to adhere to the deal. When she fired her lawyer and insisted she would try her claims, Wal-Mart moved to enforce the settlement agreement. Having carefully considered the testimony and other evidence presented at the evidentiary hearing on that motion, I grant Wal-Mart's motion to enforce the parties' settlement agreement and direct Pate to file a petition to compromise D.P's claim as Nevada law requires. And because this case will not proceed to trial, I deny Pate's request to continue the trial as moot.

**Procedural History**

Quatrela Pate brings this negligence claim against Wal-Mart on behalf of herself and as guardian ad litem for her minor son, D.P., claiming that several boxes fell on them while they were shopping at a Wal-Mart store in North Las Vegas, Nevada. A week before trial, Pate's attorney Donald Kudler, Esq.—her third in this litigation—represented during calendar call that the parties had reached a settlement, and I vacated the trial.[1] But Pate became dissatisfied with the amount she would net from the settlement and disavowed the agreement. This decision resulted in an impasse between Pate and Kudler, and they both moved for Kudler to withdraw as

---

[1] ECF No. 60.

counsel, a request that I granted after a hearing.[2]

   At that hearing, Pate claimed that she had revoked Kudler's authority to settle before Wal-Mart accepted the settlement offer that he made on her behalf, and she has no intention of being bound by the settlement deal.[3]  So I reset the case for an April 19, 2016, trial date.[4]

   Pate's disavowal of the settlement agreement prompted Wal-Mart to file this emergency motion to enforce the settlement.[5]  Wal-Mart argues that Nevada law presumes that an attorney has settlement authority and that Pate has failed to rebut this presumption.  Pate responds that the evidence, including a fax she allegedly sent to Kudler before Wal-Mart accepted the settlement offer, demonstrates that she revoked his settlement authority.  She further argues that the agreement is unenforceable because the terms Kudler approved include a paragraph that mistakenly represents that Pate is not a Medicare beneficiary, and signing it would force her to commit Medicare fraud.[6]

   At the March 1, 2016, evidentiary hearing on the motion to enforce the settlement, the parties and Kudler presented conflicting versions of the events underlying the settlement offer and acceptance.  Pate (representing herself because she had not yet found an attorney to replace Kudler[7]) testified and offered testimony from a witness who claimed to have overheard a snippet of a telephone conversation Pate had in the lobby of her Siegel Suites apartment building on October 26, 2015.[8]  Wal-Mart called Kudler to testify and also put up the manager of Pate's

---

[2] *See* ECF No. 54–57.

[3] ECF No. 59.

[4] *Id.*

[5] ECF No. 61.

[6] ECF No. 65.

[7] She retained a new attorney on April 1, 2016.  *See* ECF No. 79.

[8] ECF No. 70 (minutes).

residence to testify about standard fax practices.  I took the matter under advisement.[9]

Because the April 19, 2016, trial date was rapidly approaching, on March 30, 2016, I advised the parties by minute order that I was granting Wal-Mart's motion to enforce the settlement agreement, and I vacated the trial date and all other related hearings and deadlines.[10]  I now explain that decision and address the remaining motion to continue trial.

### Discussion

The facts in this case and their relevance divide into two issues: (1) Did Pate revoke Kudler's authority to settle her claim and the one she was pursuing on behalf of her son and, if so, (2) Did the parties, through their attorneys, orally agree to the material terms of the settlement agreement and thereby enter into an enforceable contract on October 26, 2015?

**A.    Kudler had Pate's authority to enter the settlement agreement.**

Kudler was Pate's third retained attorney in this case.  He made his first appearance on behalf of Pate on October 20, 2014,[11] after Pate's two previous attorneys successfully moved to withdraw.[12]  There is no dispute that Kudler was Pate's attorney on October 26, 2015.

**1.    The record of the settlement discussions as developed at the evidentiary hearing**

Before the parties reached an agreement on October 26, 2015, they had negotiated the settlement amount through a series of emailed offers and counteroffers conveyed by their attorneys.  Each time, Wal-Mart conditioned its offer on several terms, including Pate executing

---

[9] Pate then filed a motion to reduce Kudler's attorney's fees under her contingency fee agreement with him by 90%, a motion to reopen discovery, a motion to continue the April 19, 2016, trial, and a motion requesting that I reconsider my October 2015 rulings on Wal-Mart's motions in limine.  ECF No. 71, 73, 75, 76.  After she retained a new attorney, Pate filed a notice of withdrawal for the motions to reduce attorney's fees, to reopen discovery, and for reconsideration.  ECF No. 80.

[10] ECF No. 78.

[11] ECF No. 43.

[12] ECF No. 15, 32.

Wal-Mart's "standard" release and completing a "lien-verification form."[13]  Though Kudler, on behalf of Pate, rejected at least two offers and countered with a higher settlement amount, there is no evidence that either Kudler or Pate objected to Wal-Mart's standard settlement-agreement terms.  And Kudler avers that he explained to Pate on several occasions that her ultimate recovery would be calculated by deducting from the gross settlement amount the outstanding liens from her prior attorneys and medical providers.[14]

On Friday, October 23, 2015, Wal-Mart's attorney, Brenda Entzminger, emailed Kudler to reject his offer of $200,000 with a $125,000 counteroffer.[15]  Pate claims that Kudler called her on Sunday, October 25, to update her that Wal-Mart had rejected the offer but that he did not inform her of the counteroffer.[16]  She further claims that, later that evening, she decided that no settlement amount would make her whole,[17] so she decided to take her case to trial.[18]  Pate, however, did not speak to Kudler again until the next morning.

On Monday, October 26, Kudler decided to make a final attempt to settle the case before arriving to court for the 1:30 p.m. calendar call.[19]  He called Entzminger early that morning and made a $150,000 settlement offer, which Entzminger accepted later that morning.  However, in the midst of these events, Pate made two phone calls to Kudler.  The timing and content of these calls are partially in dispute, and my resolution of these disputed facts determines whether Pate revoked Kudler's settlement authority.  I therefore discuss both versions of events.

---

[13] *E.g.*, ECF No. 67-2 at 3; ECF No. 61-2 at 1; ECF No. 61-3 at 1.

[14] ECF No. 67-1 at 4–5.

[15] ECF No. 61-2 at 1.

[16] ECF No. 70 at 10:13–:14.

[17] *Id*. at 10:16.

[18] *Id*. at 10:20.

[19] *See* ECF No. 53.

### a.     Pate's first phone call

Pate called Kudler on Monday morning at 8:20 a.m.[20]  Pate's electronic record of the call shows that the call lasted more than six minutes.[21]  She claims that the call unexpectedly ended after her phone stopped working due to a technical issue.[22]  What Pate and Kudler spoke about during these few minutes is disputed.

Pate claims that she made clear to Kudler that she did not want to settle the case unless the settlement amount was large enough to guarantee that she would have $100,000 in her pocket after her liens and attorney's fees were satisfied and paid.[23]  During the evidentiary hearing, Entzminger asked Pate what had caused her to change her mind between Sunday night and Monday morning—from deciding she wanted to go to trial to deciding that there was a settlement amount she was willing to accept.[24]  Pate never directly answered this question.

Conversely, Kudler testified that he and Pate discussed making the $150,000 offer to Wal-Mart during the 8:20 a.m. call and that Pate approved this offer amount.[25]  He acknowledges that Pate did eventually state her $100,000 post-lien demand, but not during this call.

### b.     Kudler's offer and Wal-Mart's acceptance

Kudler testified that he called Entzminger at some point after the 8:20 a.m. call with Pate and made a $150,000 settlement offer.  At 9:51 a.m., Entzminger emailed Kudler to confirm the offer amount and that it would still be conditioned on Wal-Mart's additional terms, including the

---

[20] ECF No. 65 at 12.

[21] *Id*.

[22] *Id*. at 2.

[23] ECF No. 70 at 10:22.

[24] *See, e.g.*, *id*. at 10:22–:23.

[25] ECF No. 67-1 at 4; ECF No. 70 at 10:53–:54.

5

release and lien-verification form.[26]  She also informed Kudler that she needed to confer with Wal-Mart before deciding whether to accept the offer.[27]  By 11:20 a.m., Kudler had not received an answer from Entzminger, so he sent her an email letting her know that he could be reached on his cellphone.[28]  Entzminger replied a minute later, informing Kudler that she was still waiting on an answer from Wal-Mart.[29]  At some point in the ensuing 20 minutes, Entzminger called Kudler to accept the $150,000 offer on Wal-Mart's behalf.[30]  Kudler and another Wal-Mart attorney (not Entzminger) appeared for the 1:30 p.m. calendar call, and both attorneys represented to me on the record that their clients had settled.[31]

### c.  *Pate's second phone call with Kudler*

After the 8:20 a.m. call ended, Pate eventually went to the front desk of her apartment building to make a second call to Kudler from the public phone.  Pate testified that she called Kudler around 9 a.m. to continue the 8:20 a.m. conversation that was disrupted by her cellphone malfunction.[32]  At this point, however, Pate's testimony once again shifted: she testified that the

---

[26] ECF No. 61-3 at 1.

[27] *Id*.

[28] ECF No. 61-4 at 1.

[29] ECF No. 61-5 at 1.

[30] This time range is derived from an email that Entzminger sent to another attorney from her firm at 11:48 a.m., informing him that "we now have a deal at $150k" and that she had "just confirmed" this deal with opposing counsel (i.e., Kudler).  ECF No. 61-6.  Entzminger asked this colleague to represent during calendar call that a settlement had been reached.  *Id*.

[31] ECF No. 53.

[32] ECF No. 70 at 10:24–:25.  Pate did present a witness, Teresa Foster, the then-manager of Siegel Suites, who testified that she believed Pate placed a call from the lobby (presumably to Kudler) at around 8:30 or 9:00 a.m.  *Id*. at 11:16.  Foster pegged the phone call to this time because she believed that the mail had just arrived and that it usually arrived on Mondays around 9 a.m.  *Id*. at 11:18.  However, Foster acknowledged that the mail sometimes arrived earlier or later.  I find that Foster's testimony is therefore not a reliable indication of when Pate placed the second phone call.

purpose of her second call was to tell Kudler that she did not want to settle and wanted to proceed to trial.[33]

Kudler disputes Pate's claim that the second call happened at 9 a.m.  He testified that he believed this call occurred closer to 10:30 or 11:00 a.m.[34]  He testified that he was on the phone with Pate but placed her on hold when he saw there was an incoming call from Entzminger—the call where Entzminger accepted the $150,000 offer.[35]  Kudler also claims that, after he returned to Pate's call, he informed her that Wal-Mart had accepted their $150,000 offer.[36]

Kudler contends that it was only in response to this news—rather than during the pre-offer phone call at 8:20 a.m.—that Pate stated that she would only accept a $150,000 settlement if she was guaranteed to clear $100,000.[37]  Kudler claims that this condition was a surprise because Pate had never before conditioned the settlement on a net figure, and Pate had always known that her liens would have to be satisfied out of the gross settlement amount.[38]  Pate did not refute this characterization.  Kudler testified that, during this second call, he explained that he could not guarantee Pate would clear $100,000 and also stated that he doubted she would be left with $100,000 considering the amount of her liens and the attorney's fees she owed him.[39]

While both the timing and content of this second call are disputed, Pate and Kudler both

---

[33] *Id.* at 10:25 ("Then that's when I was wanting to try to finish and discuss with him that I don't want to settle at all.  I want to take this case to trial.").

[34] *Id.* at 10:51.

[35] *Id.* at 10:51–:52.

[36] *Id.* at 10:52–:53.

[37] ECF No. 67-1 at 4–5; ECF No. 70 at 10:52–:53.

[38] ECF No. 67-1 at 4–5.  *See also* ECF No. 63-1 at 1 (contingency fee agreement that notes, "After deduction of attorney's fees and costs, any medical expenses owing are deducted from the client's portion of the recovery.").

[39] *Id.* at 5.

testified that, at some point during the call, Kudler stated, in reference to the settlement agreement, "It's settled, it's over, it's done."[40]  Pate also testified that she told Kudler she did not want to settle only after he had made this statement.[41]  Kudler testified that he made this statement after explaining to Pate that, by insisting on the additional $100,000 condition, she was attempting to renege on a deal that she had authorized him to make and that Wal-Mart had just accepted.[42]

### d.    Pate's alleged fax to Kudler

Pate also alleges that she faxed a letter to Kudler's law office immediately after their second call ended.  The letter's subject line reads, "I do not want to settle[.]  Pate v. Walmart 2:12-cv-01377-JAD-PAL."[43]  The first sentence also reiterates this point: "We just got off the phone and I do not want to settle the case."[44]  The letter is addressed to "Attorney Donald Kudler" and includes his fax number in the top-right corner.[45]  Curiously—or perhaps tellingly—the letter is dated "10/26/201**6**."[46]  When Pate was asked at the hearing why the letter was dated 2016 when she allegedly faxed it in 2015, she responded that she suffers from Post Traumatic Stress Disorder and often makes mistakes.[47]

Pate alleges that she handed her letter to a front-desk employee at her extended-stay hotel,

---

[40] ECF No. 70 at 10:33, 10:53.

[41] *Id*. at 10:33.

[42] *Id*. at 10:52–:53.

[43] ECF No. 65 at 14.

[44] *Id*.

[45] *Id*.; ECF No. 70 at 10:44.

[46] ECF No. 65 at 14 (emphasis added).

[47] ECF No. 70 at 10:01–:02.

who faxed the letter on her behalf.[48]  Two employees from the company testified that it is the custom and practice for employees to fax documents on behalf of their guests and to always offer the guest a fax-confirmation page.[49]  Pate alleges that the employee who sent her fax did not offer her a confirmation page and that she did not wait for one because she was "distraught."[50]

Kudler testified that he never received a fax from Pate that day.[51]  He asserts that he would have recalled the fax because its message—i.e, that Pate did not want to settle the case—contradicted her statement from the second call that she would only settle if she could be guaranteed $100,000 post-lien satisfaction.[52]  Wal-Mart subpoenaed Kudler's incoming fax records from October 26, 2015.[53]  The records reflect that Kudler's office received no fax from Pate.[54]

### 2. Pate did not rebut the presumption under Nevada law that Kudler had her authority to agree to the settlement.

"Nevada law presumes that an attorney has authority to settle his client's claim, but that presumption can be overcome by proof that the attorney did not have authority to do so."[55]  The Nevada Supreme Court's unpublished disposition in *Edwards v. Babcock* provides guidance.  In *Edwards*, the plaintiff's attorney entered into a settlement agreement on behalf of his client, who

---

[48] *Id*. at 10:01.

[49] *Id*. at 10:38, 11:21–:22, 11:36.

[50] *Id*.

[51] ECF No. 67-1 at 5–8.

[52] *Id*.

[53] *See* ECF No. 68-1.

[54] ECF No. 70 at 10:45.

[55] *Edwards v. Babcock*, 238 P.3d 808, *2 (Nev. 2008) (citing *State v. Cal. Mining Co.*, 15 Nev. 234, 243 (1880)); *see also Waits v. Weller*, 653 F.2d 1288, 1291 n.2 (9th Cir. 1981) ("[U]nder Nevada law an attorney is presumed to have authority to settle his client's claim.").

later refused to sign the written agreement and claimed that he never agreed to settle for

$85,000.[56]  While the plaintiff did place his initials on an $85,000 offer of judgment from his

attorney, he alleged that the attorney misled him by assuring him that the defendants would reject

the offer amount and that this procedure would potentially allow the plaintiff to recover

attorney's fees.[57]  However, the attorney attested "that he had discussed the legal effect and

ramifications of the" offer with the plaintiff.[58]  After the defendants accepted the offer, the

plaintiff informed his attorney he wanted to go to trial instead of settling.[59]

The trial court found that the attorney was authorized to make the offer on his client's

behalf and that a settlement agreement therefore existed.[60]  Deferring to the trial court's factual

findings, the Nevada Supreme Court affirmed the holding.[61]  The Court reasoned that the

plaintiff's "belated attempt to revoke [his attorney's] authority . . . , made after the offer of

judgment had been made and accepted, show[ed] that [the attorney] had authority to settle the

case before" the attempted revocation.[62]

Whether Kudler had authority to settle Pate's claim depends on what testimony I find

credible and which version of events I accept.  On one hand is Pate's contention that her first and

second phone calls to Kudler, along with the fax, all conveyed the same message: she did not

want to settle the case or at least not for an amount that did not guarantee her $100,000 after

satisfying her liens.  On the other hand, Kudler alleges that Pate granted him authority to make

---

[56] *Edwards*, 238 P.3d at *1.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.* at *2.

[61] *Id.*

[62] *Id.*

10

the offer after the first phone call and that she only attempted to revoke that authority at the end

of the second call—after Wal-Mart had accepted the offer.  After considering all the testimony

and additional evidence presented, I conclude that Pate only attempted to revoke Kudler's

settlement authority after Wal-Mart accepted the offer he made on Pate's behalf.  The parties

therefore entered into an oral agreement through their attorneys.

In reaching these conclusions, I find that much of Pate's testimony is not credible for

several reasons.  First, her version of events during the hearing was inconsistent.  She testified

that on Sunday night she decided she wanted to take her case to trial but, by her first call to

Kudler the next morning, she was willing to settle if she was left with $100,000 post-lien

satisfaction.  Pate then alleges that she called Kudler a second time to reiterate that she wanted to

go to trial.  During her testimony, Pate never claimed that she was merely being indecisive and

changing her mind throughout the day.  Instead, she appeared to be simultaneously offering two

contradictory versions of events.

Second, Pate's timeline of events is illogical.  She alleges that her second phone call with

Kudler occurred around 9 a.m., which was before Entzminger confirmed the terms of Kudler's

$150,000 offer via email at 9:51 a.m. and well before Entzminger accepted the offer shortly after

11:21 a.m.  Pate has provided no reason why Kudler would have ignored her instruction to not

settle the case and why he did not revoke the $150,000 offer when Entzminger emailed him at

9:51 a.m.  It is also evident from Kudler's 11:20 a.m. email to Entzminger—providing her his

cellphone number in the event that Wal-Mart agreed to the offer while he was driving to court for

calendar call—that he was still awaiting a response from her.  And both Pate and Kudler agree

that he stated "it's over, it's settled, it's done" during the second phone call.  If this call occurred

at 9 a.m., there is no logical reason for Kudler to have made this definitive statement more than

two hours before Entzminger accepted the offer.

Finally, Pate's claim that she faxed Kudler a letter after the second phone call is not

credible.  Employee testimony established that it was the custom and practice at Siegel Suites to

provide guests a fax-confirmation page, and Pate has none.  Even more compelling is that Kudler's phone records show that his office never received this fax.  The fact that Pate dated her letter October 26, 201**6**, suggests that she wrote the letter in 2016 because it is not common to mistakenly date a document with the *upcoming* year three months before the New Year—in contrast to the common mistake of writing the previous year during the first few weeks of January.  Considering all these facts, it is likely that Pate manufactured this evidence, which negatively reflects on her overall credibility.

In contrast, Kudler's version of events provides a consistent and logical timeline.  After receiving a $125,000 offer on Friday, Kudler attempted to reach a higher settlement amount on Monday morning before calendar call.  When Pate called him on Monday at 8:20 a.m., they discussed making a $150,000 offer, but then her phone cut out.  Based on the history of each prior offer, it was clear to Pate that this amount, if accepted by Wal-Mart, would be a gross sum that would have to satisfy her outstanding liens.  Kudler called Entzminger shortly after this call with Pate to make the offer, which she confirmed with her 9:51 a.m. email.  Pate called Kudler after 11:21 a.m. to continue their earlier phone call, and he placed her on hold to take the incoming call from Entzminger, who then accepted the $150,000 offer on Wal-Mart's behalf.[63] After Kudler returned to Pate's call and informed her that Wal-Mart had accepted the offer, Pate began—for the first time—to insist that she clear $100,000 from the settlement.  The two argued and Kudler stated, "It's over, it's settled, it's done."  Only then did Pate state that she did not want to settle and wanted to take the case to trial.

Based on these factual findings, I conclude that there is no credible evidence that Pate revoked Kudler's settlement authority *before* Wal-Mart accepted his $150,000 offer.  Pate has therefore failed to rebut the presumption under Nevada law that Kudler had this authority.  Accordingly, Kudler entered into an oral agreement on Pate's behalf when Wal-Mart accepted

---

[63] While Kudler testified during the hearing that he believed this call occurred around 10:30 or 11 a.m., this time range was an estimate that he proffered based on his recollection of a phone call that took place months earlier.  This minor discrepancy is therefore understandable and does not contradict the established timeline.

the $150,000 offer.

**B.     The settlement agreement reached on October 26, 2015, is enforceable.**

Pate contends that, even if Kudler had the authority to enter a settlement agreement with
Wal-Mart on October 26, 2015, the deal Kudler and Wal-Mart reached is unenforceable because
it incorporates Wal-Mart's standard settlement terms for plaintiffs who are *not* recipients of
Medicare or Medicaid.  Because Pate and her son are beneficiaries of Medicare and Medicaid,
respectively, Pate argues she would be committing fraud by signing an agreement that represents
that she is not a Medicare recipient.  Wal-Mart responds that its counsel simply attached the
wrong version of the standard settlement agreement to the email and that the representation that
Pate is not a Medicare recipient is not a material term of the settlement—only the disclosure of
her Medicare status is.

**1.      The terms of the settlement agreement as established at the evidentiary
hearing**

When Entzminger made a $125,000 offer on behalf of Wal-Mart on October 23, she
conditioned the offer—like each prior offer—on several terms, including Pate executing a "lien
verification form" and "Walmart's Standard Release," and completing the process for approving
D.P's minor's compromise as Nevada law requries.[64]  When Kudler called Entzminger with the
$150,000 counteroffer on October 26, 2015,[65] it also adopted these terms from Entzminger's
offer and incorporated them into the offer's terms.[66]

In her October 23 email, Entzminger copied the lien-verification form's text into the body
of the email.[67]  The form required Pate to certify whether there were outstanding liens or
subrogation claims against her "from any healthcare providers, insurance companies, or

---

[64] ECF No. 61-2 at 1; ECF No. 61-5 at 1.

[65] ECF No. 67-1 at 4.

[66] ECF No. 61-3 at 1 ("This [email] will confirm that plaintiff has extended an offer of $150,000
with the conditions set forth in the email below."); ECF No. 61-5 at 1.

[67] ECF No. 61-2 at 1.

governmental entities **including, but not limited to, Medicare and/or Medicaid**."[68]

Entzminger attached the release to the email.  The email attachment is titled "General BI Release

(NONMEDICARE)."  The document itself is titled "Full and Final Confidential Settlement,

Release of all Claims[,] and Indemnity Agreement."[69]

   Part 3 of the agreement is entitled "Declaration of Medicare Non-Eligibility; Payment of

Health Care or Other Benefits; Payment and Satisfaction of all Liens."[70]  Paragraph (a) states that

> Plaintiff hereby declares, represents and warrants to Walmart that
> [he/she] **is not eligible** for Medicare benefits, that [he/she] **will not
> become eligible** for Medicare benefits within sixty (60) days of the
> Effective Date, and that **none** of the heath care treatments Plaintiff
> received for any claimed injuries . . . arising out of or related to the
> incident were **submitted to** or **paid by** Medicare or will be
> submitted to Medicare for payment.[71]

The agreement states that this "declaration and representation is a material and non-waivable

term . . . ."[72]  Subsequent paragraphs under Part 3 address any of Pate's outstanding liens related

to her claimed injury and represent that she has disclosed these liens to Wal-Mart, including liens

held by "Medicaid, any insurer, any hospital or health care provider, any health plan, any

government agency or authority[,] or any other person or entity."[73]  Finally, the agreement also

states that the settlement payment "is intended to satisfy" these outstanding liens.[74]

   Contrary to the representation in paragraph (a), Pate has been a Medicare beneficiary

since 2013.[75]  Nobody disputes this.  During the March 1, 2016, evidentiary hearing, Entzminger

---

[68] *Id*. (emphasis in original).

[69] *Id*. at 5.

[70] *Id*.

[71] *Id*. (emphasis in original).

[72] *Id*.

[73] *Id*.

[74] *Id.*

[75] ECF No. 70 at 11:28–:29.

represented that Kudler emailed her on December 30, 2015, stating that he reviewed the settlement agreement with Pate, who had noticed the mistaken representation.[76]  Kudler therefore asked for a revised written agreement that correctly represented her Medicare status.[77]  Entzminger had not yet provided Kudler this revision, likely because Pate had moved to discharge Kudler less than two weeks later.[78]

During the hearing, Entzminger, an officer of the court, represented that she included the non-Medicare provision in the agreement in order to ensure Wal-Mart complies with Medicare's reporting requirement.[79]  While she did not elaborate on this requirement in either the hearing or her briefings, she is very likely referring to the Medicare Second Payer Act ("MSP").[80]  Under MSP, Medicare is the "second payer" for a Medicare beneficiary's health care if a "primary plan" is responsible for payment (e.g., "an automobile or liability insurance policy").[81]  To guarantee prompt treatment, Medicare may make the initial payment, conditioned on repayment by the primary plan.[82]  "A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release . . . , or by other means."[83]  If Medicare has made a "primary payment for services for which the primary payer has made or should have made primary payment, [the primary payer] must provide [Medicare] notice about primary payment responsibility . . . ."[84]

---

[76] *Id*. at 9:52–:53.

[77] *Id*.

[78] *See* ECF No. 55.

[79] ECF No. 70 at 9:52.

[80] 42 U.S.C. § 1395y(b)(2).

[81] *Id*. § 1395y(b)(2)(A).

[82] *Id*. § 1395y(b)(2)(B).

[83] *Id*. § 1395y(b)(2)(B)(ii).

[84] 42 C.F.R. § 411.25.

## 2.   The mistaken Medicare provision does not render the agreement unenforceable.

Pate argues that enforcing the settlement agreement with Wal-Mart would force her to commit Medicare fraud by erroneously representing that she is not a Medicare beneficiary.[85] Wal-Mart responds that, because this representation is an error and not one of the agreement's material terms, the contract between the parties is enforceable.

An enforceable contract requires "an offer and acceptance, meeting of the minds, and consideration."[86] "A meeting of the minds exists when the parties have agreed upon the contract's essential terms."[87] In *May v. Anderson*, the Nevada Supreme Court held that "[a] contract can by formed . . . when the parties have agreed to the material terms, even though the contract's exact language is not finalized."[88] Thus, "a party's refusal to later execute a release document after agreeing upon the release's essential terms does not render the settlement agreement invalid."[89] "Which terms are essential [i.e., material] 'depends on the agreement and its context and also on the subsequent conduct of the parties, including the dispute [that] arises and the remedy sought.'"[90]

In *May*, the plaintiffs' attorney, with his clients' consent, entered into settlement negotiations with the defendants, who offered a $300,000 payment in exchange for a general release of all claims.[91] Although the attorney accepted the offer, two of the plaintiffs later

---

[85] ECF No. 65 at 5.

[86] *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).

[87] *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 255 (Nev. 2012) (citing *Roth v. Scott*, 921 P.2d 1262, 1265 (Nev. 1996)).

[88] *May*, 119 P.3d at 1257.

[89] *Id*. at 1256.

[90] *Certified Fire Prot.*, 283 P.3d at 255 (quoting Restatement (Second) of Contracts § 131 cmt. g (Am. Law Inst. 1981)).

[91] *May*, 119 P.3d at 1256.

objected to "[t]he form of the general release" because it extinguished all future claims against one of the defendant-tortfeasors, whom the plaintiffs felt was responsible for their daughter's death.[92]   The plaintiffs therefore refused to execute the release, and the defendants sued to enforce the agreement.[93]   The Court held that an enforceable contract did *not* exist because the parties had not agreed to "the essential terms of the release[,]" which "constitutes a material term of the settlement contract."[94]   The Court reasoned that "[r]elease terms are not a mere formality. They are an important reason why a party enters into a settlement agreement.   If the prevention of future litigation is one of the primary goals of a settlement, the essential terms of the release that are needed to achieve that goal are material to the settlement agreement."[95]

Wal-Mart argues that the settlement agreement's representation that Pate is not a Medicare beneficiary is *not* material to the contract.[96]   Instead, it is the agreement's inclusion of the declaration that is material.[97]   In other words, Wal-Mart's settlement offer was *not* conditioned on whether Pate was receiving or eligible to receive Medicare benefits.   Rather, as attorney Entzminger's October 23 email makes clear, Wal-Mart's offer was conditioned on five listed terms, which, as relevant here, include Pate agreeing to Wal-Mart's general release and completing the lien-verification form.

Because federal law requires Wal-Mart to report settlements paid to Medicare beneficiaries,[98] ascertaining Pate's Medicare status was one of Wal-Mart's "primary goals" and

---

[92] *Id*.

[93] *Id*. at 1257.

[94] *Id*. at 1258.

[95] *Id*.

[96] ECF No. 70 at 9:51–:52.

[97] *Id*.

[98] *See* 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.25.

thus material to the contract.  To achieve this goal, Wal-Mart included the lien-verification form, which seeks to determine whether Medicare would have a claim to any portion of the settlement. Similarly, Wal-Mart included a representation in its release, under Part 3, regarding Pate's Medicare status.  The representation that Pate was not a Medicare beneficiary was an error, which Wal-Mart only discovered when Pate and her attorney reviewed the release in late December 2015.

Unlike the plaintiffs in *May*, who objected to the release's content and effect, there is no evidence in the record that Pate objected to the written release declaring her Medicare status or to Wal-Mart, as a primary payer, reimbursing any accident-related medical expenses paid by Medicare.  And Pate's subsequent conduct—i.e., her attorney asking Wal-Mart to revise the agreement to correctly state her Medicare status—demonstrates her assent to the material terms of the contract.  Accordingly, the settlement agreement that Pate and Wal-Mart, through their attorneys, orally entered into on October 26, 2015, is enforceable, regardless of Pate's present unwillingness to execute its written form.  Pate must execute Wal-Mart's lien-verification form and its standard release for Medicare/Medicaid recipients or be bound to those terms nevertheless.

**C.     Pate must submit a petition to approve her son's $3,000 settlement.**

Finding that Pate settled her claim and that of her son and that the settlement agreement is enforceable does not end this settlement process, however.  When a parent settles an unemancipated minor's claim for money, NRS 41.200 requires the parent to petition the court to approve the child's settlement.  The petition is a comprehensive document.  It must set forth: (a) The name, age, and residence of the minor; (b) The facts that bring the minor within the purview of this section, including (1) The circumstances that make it a disputed claim for money; (2) The name of the third person against whom the claim is made; and (3) If the claim is the result of an accident, the date, place, and facts of the accident; (c) The names and residence of the parents or the legal guardian of the minor; (d) The name and residence of the person or persons having physical custody or control of the minor; (e) The name and residence of the petitioner and the

relationship of the petitioner to the minor; (f) The total amount of the proceeds of the proposed compromise and the apportionment of those proceeds, including the amount to be used for: (1) Attorney's fees and whether the attorney's fees are fixed or contingent fees, and if the attorney's fees are contingent fees, the percentage of the proceeds to be paid as attorney's fees; (2) Medical expenses; and (3) Other expenses, and whether these fees and expenses are to be deducted before or after the calculation of any contingency fee; (g) Whether the petitioner believes the acceptance of this compromise is in the best interest of the minor; and (h) That the petitioner has been advised and understands that acceptance of the compromise will bar the minor from seeking further relief from the third person offering the compromise.[99]   And when the claim involves allegations of personal injuries like this one does, the petitioner must submit "all relevant medical and healthcare records to the court at the compromise hearing.  The records must include documentation of: (a) The injury, prognosis, treatment and progress of recovery of the minor; and (b) The amount of medical expenses incurred to date, the nature and amount of medical expenses [that] have been paid and by whom, any amount owing for medical expenses, and an estimate of the amount of medical expenses [that] may be incurred in the future."[100]   If the court approves the compromise of the minor's claim, "the court must direct the money to be paid to the father, mother[,] or guardian of the minor," who must deposit it into a blocked account for the benefit of the minor.[101]

The settlement agreement globally resolved both Pate's individual claim and the one she brought on behalf of her son, D.P.  Per the negotiated terms, $3,000 of the total settlement is earmarked to resolve D.P.'s claim.[102]  Pate (through her newly retained counsel) has until May 13, 2016, to file a petition to compromise D.P.'s claim that complies with NRS 41.200.  No

---

[99] Nev. Rev. Stat. § 41.200(2).

[100] Nev. Rev. Stat. § 41.200(3).

[101] Nev. Rev. Stat. § 41.200(4), (5).

[102] ECF No. 61-5 (10/23/15, 1:14:25 p.m. email).

funds may be disbursed under the settlement agreement until the petition to compromise D.P.'s claim has been adjudicated.

**D.     Pate's remaining motion**

Still pending is Pate's motion to continue the April 19, 2016, trial date.  Because I already vacated that trial date,[103] Pate's motion for a continuance of trial [ECF No. 75] is denied as moot.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that Wal-Mart's **Motion to Enforce Settlement [ECF No. 61] is GRANTED**.  **Plaintiff Quatrela Pate is directed to do the following (through counsel) by May 13, 2016:**

- **Complete Wal-Mart's lien-verification form** and provide Wal-Mart the complete information it requests about her Medicare status and benefits and about any other liens including attorney and medical-provider liens so that Wal-Mart can satisfy any outstanding liens from the gross settlement amount before distributing the remainder of the settlement funds to Pate.  Wal-Mart is directed to promptly deduct and pay off from the gross settlement amount all outstanding liens that Pate timely discloses before paying the remainder of the settlement funds to Pate.  Wal-Mart must ensure that Pate is provided with all necessary documents for completion;

- **Execute and return to Wal-Mart counsel Wal-Mart's Standard Release** for Medicare/Medicaid recipients, which will not become effective unless and until Wal-Mart tenders the settlement funds; and

- **Prepare and file with this court a Petition to Compromise Minor's Claim** in compliance with NRS 41.200.

---

[103] ECF No. 78.

IT IS FURTHER ORDERED that **Pate's Motion to Continue Trial [ECF No. 75] is DENIED as moot.**

Dated April 15, 2016

_____
Jennifer A. Dorsey
United States District Judge